IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ERIC WASHINGTON,

Defendant.

CRIMINAL CASE NO.

1:19-CR-00145-WMR-JFK

## <u>REPORT AND RECOMMENDATION</u>

Pending before the court are Defendant Eric Washington's motion [Doc. 18] to suppress statements made on June 23, 2018, motions [Docs. 19 and 38] to suppress evidence obtained from his residence on December 19, 2018, and motion [Doc. 20] to suppress evidence obtained in connection with the arrest of Defendant on June 23, 2018, and July 3, 2018.  An evidentiary hearing was held on October 29, 2019, on Defendant's motions to suppress.[1]  [Doc. 36].  In his post-hearing brief, Defendant states that he withdraws his motion [Doc. 20] to suppress evidence seized on June 23, 2018, and on July 3, 2018 [Doc. 38 at 7-8], and the Government states that it will not introduce into evidence, except for purposes of impeachment if Defendant testifies at trial, any statements made by Defendant on June 23, 2018, mooting Defendant's

---

[1]Citations to the transcript of the hearing are:  (Tr. at ).

motion [Doc. 18] to suppress statements [Doc. 39 at 2 n.1].[2]  For these reasons, Defendant and the Government solely focus in their post-hearing briefs on the circumstances leading to the search of Defendant's residence on December 19, 2018. The court will, therefore, recommend that Defendant's motions [Docs. 18 and 20] be denied as moot.

Defendant argues that the law enforcement officers did not conduct a lawful knock and talk on December 19, 2018, because they solely approached Defendant's residence for the purpose of gaining entry into the residence in order to obtain consent to conduct a search.  [Doc. 38 at 4-6].  Defendant also argues that, while law enforcement officers may lawfully conduct a knock and talk to investigate complaints related to drug activity, which is the reason stated by the officers, the officers in this case conducted the knock and talk for the invalid purpose of investigating the legitimacy of Defendant's lease which is not a valid law enforcement objective.  [Id. at 6-7].  In response, the Government argues that the knock and talk was objectively reasonable, undertaken for a legitimate law enforcement purpose, was consensual and did not implicate Defendant's Fourth Amendment rights.  [Doc. 39 at 7-9].  The

---

[2]The Government incorrectly identifies the motion to suppress statements as docket entry 19.  [Id.].

Government also contends that the evidence does not support Defendant's argument that the officers conducted the knock and talk with the intent to obtain entry into the apartment and a consent to search but, even if that was their intent, argues that evidence gathering is not an impermissible purpose of a knock and talk. [Id. at 9-11]. As to the officers' intent to investigate the legitimacy of Defendant's lease, the Government asserts that the record does not support finding an intent to do so and that, even if it did, investigating attempted fraud would constitute a legitimate investigative purpose for the knock and talk. [Id. at 12]. Defendant, although allowed the opportunity to do so, did not reply to the Government's arguments.

Having considered the arguments of the parties, the totality of the circumstances surrounding the police conduct on December 19, 2018, and binding and/or persuasive legal authority, the court will recommend denying Defendant's motion to suppress evidence.

## I.    Background Facts

On December 19, 2018, Cobb County Officer Brian Scurr, who is the courtesy officer at the Vinings Ridge Apartment complex, was informed of a complaint about

the odor of marijuana emanating from one of the apartments in the complex.[3] (Tr. at 6-7, 8, 18-21).   Officer Scurr was advised by the apartment complex assistant manager, Tish (no last name provided), that a long time resident had complained about the odor of marijuana coming from the apartment below, 3216 G.  (Tr. at 7-8, 19-20). Tish also advised that the lessor's name was Antonio Washington ("Defendant"), that there appeared to be a problem with the social security number provided on the lease and that there appeared to be false information provided on the lease agreement.  (Tr. at 13, 15, 19-21).   However, Tish did not request that the officer investigate the problems with the lease agreement.[4]  (Tr. at 22).   Officer Scurr routinely handles reports of drug activity, usually alone, by speaking with the offending apartment's occupant and advising the occupant to stop such activity.  (Tr. at 8, 20).  In this case because of the additional information about the problem with the social security

_____

[3]Officer Scurr had been with the police department for eleven years and is assigned to the VIPER unit which handles street crimes, including violent crimes and drug offenses.  (Tr. at 6-7).  He had been the courtesy officer at the apartment complex, where he lives, since June 2017.  (Tr. at 7).  His responsibilities at the complex include handling day-to-day problems, such as noise complaints, complaints about drug activity and anything like that.  (Tr. at 7).

[4]Officer Scurr explained that he typically does not get involved in issues about lease agreements or other, non-criminal problems at the apartment complex.  (Tr. at 20).

4

number, Officer Scurr requested that another officer, Cody Thompson, who was on his way into work, stop by and go to the apartment with him to conduct a "knock and talk" with the occupants.[5]  (Tr. at 8, 21, 23).   Both officers were dressed for work, including wearing vests with the word "Police" and wearing Cobb County police badges.  They were both armed, with the firearms holstered - remaining so throughout the contact with the apartment's occupants, and Officer Scurr was wearing a body camera which captured the interaction with the occupants.  (Tr. at 8-9, 12, 18, 23; Gov't Exh. 4).  The officers were in marked patrol vehicles.  (Tr. at 9, 23).

The officers approached the door of the apartment, and Officer Scurr knocked and announced, "police."  (Tr. at 10, 12, 20).  Just before he knocked on the door,

---

[5]Officer Scurr further explained:

> My sole purpose for going to that apartment was to investigate the odor of marijuana.  I had nothing to do with what they're doing with the leases.  She[, Tish,] told me that information to let me know that there might be something else going on and that I might want to take somebody else with me, that's the only reason I took somebody.  Now, my intention on going to that apartment had nothing to do with the social security number or anything like that.  It was solely to investigate the complaint of the odor of marijuana.

(Tr. at 22).

Officer Scurr smelled the odor of burnt marijuana.[6]  (Tr. at 10-11).  A female, identified as Tiffany Turner, opened the door, and Officer Scurr testified that the odor of marijuana became stronger indicating that the odor was coming from the apartment. (Tr. at 11).  He advised Turner that he was there due to a complaint about the odor of marijuana and that he had also smelled marijuana.  (Tr. at 12, 27).  He asked Turner if they could step inside and speak to her; she invited the officers inside the apartment.[7]  (Tr. at 12, 27-28).  The officers did not draw their weapons or use any other coercion to gain entry.  They did not demand to be allowed inside.  (Tr. at 12). Turner's demeanor was pleasant and cooperative, and the conversation was normal and was just about the complaint.  (Tr. at 12-13).

As the officers entered, Officer Scurr walked a few feet over to one side to see into the kitchen to determine whether anyone else was inside the apartment.[8]  (Tr. at

---

[6]Officer Scurr testified that he was able to detect the odor based on his training and experience, including two years on the MCS narcotics unit and investigating hundreds of drug cases involving marijuana, both raw and burnt.  (Tr. at 11-12, 25).

[7]Officer Scurr stated that the purpose of the knock and talk was to investigate the odor of marijuana and that he hoped to gain entrance into the apartment.  (Tr. at 27).  He acknowledged that, instead of asking to enter the apartment, he could have spoken to Turner outside.  (Tr. at 28).

[8]Officer Scurr denied that the officers were more vulnerable to threats inside the apartment than if they had remained outside.  He stated that the potential risks inside

6

28). In response to Officer Scurr's statement about the odor of marijuana, Turner advised that she had just been smoking in the bathroom - doing so in order to avoid smoking in front of the children. (Tr. at 13, 29). Officer Scurr asked who else lived in the apartment and if Defendant was at work. (Tr. at 14). She responded that he was in weekend jail for a drug charge. (Tr. at 13, 15). She also advised that her two male children aged twelve, who was in school, and aged fifteen, who was home sick, lived in the apartment. (Tr. at 13). She also explained that the fifteen year old was supposed to have appeared in juvenile court that day but for being sick. (Tr. at 13). At that point, Officer Scurr asked Turner if she would consent to a search of the apartment, and, after ensuring her that the apartment would not be tossed and that her belongings would be respected, Turner agreed to the search. (Tr. at 13-15). Although Officer Scurr does not always ask for consent to search, he decided to do so based on the information he found out after entering the apartment and not based on the information about the problems with the lease. (Tr. at 30-31). He testified:

> It had nothing to do with the social security number. Once I got into the apartment and started talking with Ms. Turner what started to raise my suspicions was when I asked about the other occupants and the tenant of the apartment. Once she told me that the tenant was, in fact, in jail for a

the apartment were contained whereas outside potential threats could come from anywhere. (Tr. at 28-29).

> felony and that another occupant of the apartment had failed to appear on
> a separate subpoena for juvenile court, that started to lead me to believe
> that possibly there was something else going on in the apartment. So
> that's when I decided I was going to either - - I had probable cause for
> a search warrant at that point anyway. At that point I decided to give Ms.
> Turner the benefit of the doubt to see what's in the apartment versus
> going and getting a warrant . . . .

(Tr. at 30-31). Turner led the officers to the bathroom, and they observed a partially

burned marijuana cigarette and the innards of a "blunt" or "cigar." (Tr. at 13, 31).

The fifteen year old then came out of his bedroom and asked what was

happening. (Tr. at 13-14). When the situation was explained to him, the fifteen year

old stated that no one was going to search his bedroom, and it appeared to Officer

Scurr that Turner became uncertain about her consent to search the apartment. (Tr.

at 14, 32). Officer Scurr decided to stop the search and apply for a search warrant

based solely on the odor of marijuana and not any of his observations while inside the

apartment. He advised Turner of his decision. (Tr. at 15, 32-33). Up to that point,

Turner had not asked the officers to leave the apartment. (Tr. at 14).

Officer Scurr then applied for and obtained a search warrant for the apartment

which authorized the search for "[m]arijuana, any contraband to which possession is

illegal, fruits of the crime, weapons and US currency." (Tr. at 15-16, 34; Gov't Exhs.

1, 2, 3). As a result of execution of the search warrant, quantities of marijuana

8

(packaged as if for distribution), two firearms and digital scales, along with paperwork bearing Defendant's name, were seized from the apartment. (Tr. at 16-18).[9]

Additional facts will be set forth as necessary during discussion of the motions to suppress.

## II.   Discussion

Defendant seeks to suppress the items found in his apartment on December 19, 2018, as a result of the decision by Officer Scurr to conduct a knock and talk.

### a.   Credibility of the Witness - Officer Scurr

Defendant does not directly challenge Officer Scurr's credibility. [Doc. 38]. However, in making his arguments in support of suppression, Defendant repeatedly ignores the undisputed testimony of the officer, such as regarding the purpose of the knock and talk, the officer's intentions in conducting the knock and talk and the events during the knock and talk. [Doc. 38]. For this reason, the court will briefly address witness credibility findings by the court.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than

---

[9]Besides contending that the items found in the apartment were the fruits of an unlawful knock and talk, Defendant does not otherwise challenge the search warrant or its execution. [Doc. 38].

a reviewing court to assess the credibility of witnesses." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002).  In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").  And, unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" a reviewing court should accept those findings of fact. Ramirez-Chilel, 289 F.3d at 749 (citations omitted); accord United States v. Griffith, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).  Having observed Officer Scurr's testimony, which was not contradicted by other evidence, was internally consistent and was offered without hesitation, the court finds his testimony credible and reliable for the purposes of ruling on the motion to suppress.

10

b.    **Knock and Talk**

"'It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" United States v. Spivey, 861 F.3d 1207, 1223 (quoting Welsh v. Wisconsin, 104 S. Ct. 2091, 2097 (1984)). "That is why [the court] presume[s] warrantless searches of the home are unreasonable." Id. (citation omitted). However, "[t]he Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises." United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006) (noting that the officers entered the property, walked down the driveway and knocked on the door "in order to investigate the suspicious and troubling 911 calls" which "is not prohibited by the Fourth Amendment"); and see United States v. Williams, 731 F.3d 1222, 1231 (11th Cir. 2013) (same). Such a "knock and talk," as commonly called, is a consensual encounter which does not contravene the Fourth Amendment.[10]

---

[10]The Government contends that, because the Fourth Amendment is not implicated by a knock and talk and no legitimate expectation of privacy is impacted by the officers' approach to and knock on his door, Defendant bears the burden of demonstrating by a preponderance of the evidence the invalidity of the officers' actions. [Doc. 39 at 8-9]. In United States v. Cox, 391 Fed. Appx. 756 (11th Cir.

11

Due to Defendant's argument that Officer Scurr's purpose for going to his residence was solely to gain entry into and seek consent to search his residence and that such an intent invalidates a knock and talk, the court will address the contours of the Supreme Court's and the Eleventh Circuit Court of Appeals' decisions regarding the legitimate purposes for a knock and talk.[11]  First, the determination of the officer's purpose for conducting the knock and talk is based on objectively observed factors - not the officer's subjective intent.  See Florida v. Jardines, 133 S. Ct. 1409, 1416-17 (2013) (stating that "the question before the court is precisely *whether* the officer's conduct was an objectively reasonable search" and finding that, under the

2010), noting that the Fourth Amendment is not implicated in a knock and talk, the court held that the defendant did not establish a legitimate expectation of privacy necessary to challenge the officers' approach to his residence to conduct a knock and talk.  And, for the same reason, in United States v. Holmes, 143 F. Supp. 3d 1252 (M.D. Fla. 2015), the court, noting that the defendant has the initial burden of proving a legitimate expectation of privacy, held that, because "the propriety of a knock and talk goes to the reasonableness of a defendant's expectation of privacy, . . . [the defendant] has the burden of proving, by a preponderance of the evidence, that the knock and talk was invalid." Id. at 1261.  This court, however, agrees with the court's further observation, that, "[a]s a practical matter, the allocation of the burden of proof will rarely matter, since whoever holds the burden must only demonstrate the knock and talk's validity or invalidity by a preponderance of the evidence." Id. at 1261 n.9. This court's resolution of Defendant's motion to suppress would be the same regardless of whether Defendant or the Government bears the initial burden.

[11]The court, as will be discussed *infra*, does not agree with Defendant's conclusions regarding the officers' intent based on the objective facts in this record.

12

circumstances of bringing a odor detecting dog and allowing that dog to conduct an open-air sniff of the defendant's porch, the officers' "behavior objectively reveals a purpose to conduct a search") (emphasis in original); <u>Kentucky v. King</u>, 131 S. Ct. 1849, 1859 (2011) ("'Our cases have repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.' . . . Indeed, we have never held, outside the limited contexts such as an 'inventory search or administrative inspection . . ., that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'") (citations omitted; emphasis in original); <u>United States v. Walker</u>, 799 F.3d 1361, 1363 (11th Cir. 2015) (stating that the knock and talk exception is limited, in part, "where an officer's behavior '*objectively* reveals a purpose to conduct a search'") (citation omitted; emphasis added).

And, second, while the sole purpose of the knock and talk cannot be, in essence, a ruse to conduct a search, the Supreme Court in <u>Jardines</u> clarified, "The mere 'purpose of discovering information,' . . . in the course of engaging in [the] permitted conduct [of approaching a residence in order to speak with the occupant] does not cause it to violate the Fourth Amendment. But no one is impliedly invited to enter the protected premises of the home in order *to do nothing but conduct a search*." 133 S.

13

Ct. at 1416 n.4 (citation omitted; emphasis added); and see Young v. Borders, 850 F.3d 1274, 1284-86 (11th Cir. 2017) (distinguishing the decision in Jardines which held the officers did not conduct a valid knock and talk for the legitimate police purpose of "gathering information in an investigation" because the "officers [in Jardines] did 'nothing but conduct a search' and thus violated the Fourth Amendment").   In Borders, the court found that the officers' objective conduct, contrasted to that in Jardines, of approaching the front door, without snooping around the outside, peering into windows or taking any other steps to collect evidence, and then knocking "to seek information about and locate the owner, albeit possibly armed, of the still-hot motorcycle parked out front by talking to the residents" was a lawful knock and talk.  850 F.3d at 1285-86 (citation omitted); cf. United States v. Maxi, 886 F.3d 1318, 1327 (11th Cir. 2018) (finding that the record supported a finding that the "encounter was not intended to be a casual, informational interview" evidenced by the facts that ten officers entered the property with four officers approaching the front door and the remaining officers taking tactical positions around the perimeter of the property - exceeding the geographical limits of a knock and talk, and with at least one officer having his weapon drawn; "the officers intended to secure the duplex and detain anyone they found inside, which is, of course, exactly what they did").

14

And a knock and talk is not invalid simply because, in the course of seeking to speak to the occupants of a residence in furtherance of an investigation, officers ask for and obtain consent to enter the residence and ask and gain consent to search the premises.  In United States v. Bearden, 2013 WL 1970024 (N.D. Ga. April 17, 2013), report and recommendation adopted by 2013 WL 1969906 (N.D. Ga. May 13, 2013), during the investigation of the theft of narcotics from a pharmacy which indicated that the defendant was engaged in that conduct, officers approached the defendant's residence, due to the concerns about destruction of evidence, and knocked on the defendant's front door.  Id., at **1-2.  When the defendant's husband answered, the officers identified themselves, advised that they would like to speak to the defendant, and asked to enter the residence, and they were invited inside.  Id., at *2.  When the defendant appeared, the officers explained that they were there to discuss her employment and the theft of drugs from the pharmacy, and the defendant made admissions about stealing the drugs, having some drugs in a vehicle on the premises, and, when asked, consented to a search of her residence and the vehicle.  Id., at *3.  Rejecting the defendant's challenge, the court found that, because the officers were lawfully at the defendant's home, "[f]ederal courts have recognized the knock and talk strategy as a reasonable investigative tool when officers seek to gain an occupant's

15

consent to search or when officers reasonably suspect criminal activity." Id., at *4

(quoting United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001)) (internal quotation

marks omitted).  The court stated that the agents "obviously hoped that, by knocking

on defendant's door and talking to her, she would give them consent to search." Id.;

and see King, 131 S. Ct. at 1858 ("officers may seek consent-based encounters if they

are lawfully present in the place where the consensual encounter occurs" and, "[i]f

consent is freely given, it makes no difference that an officer may have approached the

person with the hope or expectation of obtaining consent"); Holmes, 143 F. Supp. 3d

at 1258 (describing a knock and talk during which "officers approach a house with or

without probable cause and knock on the door to, for example, question the resident

about possible criminal activity there or elsewhere, or try to obtain consent to search")

(citing King, 131 S. Ct. at 1860); United States v. Benitez-Garcia, 2009 WL

10688895, at *3 (N.D. Ga. May 29, 2009) (stating that, as a part of a knock and talk,

"[i]t . . . is a valid strategy to seek an occupant's consent to a search when officers

reasonably suspect criminal activity.") (citation omitted).[12]

---

[12]And, in United States v. Laist, 702 F.3d 608 (11th Cir. 2012), although the defendant did not challenge the validity of the knock and talk but only the delay in seeking and executing a search warrant for his computers, the Eleventh Circuit Court of Appeals outlined the facts as involving an investigation of online possession and distribution of child pornography by username "Tar Heel" which led the agents to the

Applying these legal guidelines to the facts of this case, the court finds, based on the objective facts established at the evidentiary hearing, that the officers conducted a valid knock and talk on December 19, 2018.  On that date, Officer Scurr was informed of a complaint from long time resident about the odor of marijuana emanating from apartment 3216 G in the complex by the apartment complex assistant manager, Tish.  (Tr. at 6-8, 18-20).  Tish also advised that the apartment's lessor was Defendant Washington, that there appeared to be a problem with the social security number provided on the lease and that there appeared to be false information provided on the lease agreement.  (Tr. at 13, 15, 19-21).  However, Tish did not request that the officer, who typically does not get involved in issues about lease agreements or other, non-criminal, problems at the apartment complex, investigate the problems with the lease agreement.  (Tr. at 20, 22).  Although Officer Scurr routinely handles reports of

---

defendant's residence.  Id. at 610.  Three agents "visited [the defendant's] apartment . . . [and the] purpose was to conduct a 'knock and talk'-to interview the person associated with the 'Tar Heel' username and to request his or her consent to seize and search his or her computer."  Id.  And, in United States v. Valera, 2006 WL 741538 (N.D. Ga. March 20, 2006), the defendant challenged his consent to search following the officers entry into his residence.  Id., at *1.  The court noted, although not the means by which entry was ultimately gained, that "[f]rom the outset, the intent of the officers was to conduct a 'knock and talk' at the residence.  That is, they intended to knock on the door, talk to an occupant about suspected illegal activity, and obtain consent to search the house."  Id.  Nothing about the description of the officers' intent in these cases raised a red flag for either court.

17

drug activity, usually alone, by speaking with the offending apartment's occupant and advising the occupant to stop such activity, because of the additional information about the problem with the social security number, Officer Scurr requested that another officer, who was on his way into work, stop by and go to the apartment with him to conduct a "knock and talk" with the occupants.[13]  (Tr. at 8, 20-21, 23).  Both officers were dressed for work, including wearing vests with the word "Police" and wearing Cobb County police badges; they were both armed, with the firearms holstered - remaining so throughout the contact with the apartment's occupants; and Officer Scurr was wearing a body camera which captured the interaction with the occupants.  (Tr. at 8-9, 12, 18, 23; Gov't Exh. 4).  The officers were in marked patrol vehicles.  (Tr. at 9, 23).

---

[13]Officer Scurr further explained:

> My sole purpose for going to that apartment was to investigate the odor of marijuana.  I had nothing to do with what they're doing with the leases.  She[, Tish,] told me that information to let me know that there might be something else going on and that I might want to take somebody else with me, that's the only reason I took somebody.  Now, my intention on going to that apartment had nothing to do with the social security number or anything like that.  It was solely to investigate the complaint of the odor of marijuana.

(Tr. at 22).

The officers approached the door of the apartment, and Officer Scurr knocked and announced, "police." (Tr. at 10, 12, 20). Just before he knocked on the door, Officer Scurr, based on his training and experience, detected the odor of burnt marijuana. (Tr. at 10-12, 25). Tiffany Turner opened the door, and Officer Scurr testified that the odor of marijuana became stronger indicating that the odor was coming from the apartment. (Tr. at 11). He advised Turner that he was there due to a complaint about the odor of marijuana and that he had also smelled marijuana. (Tr. at 12, 27). He asked Turner if they could step inside and speak to her; she invited the officers inside the apartment. (Tr. at 12, 27-28). Officer Scurr stated that the purpose of the knock and talk was to investigate the odor of marijuana and that he hoped to gain entrance into the apartment. (Tr. at 27). The officers did not draw their weapons or use any other coercion to gain entry. They did not demand to be allowed inside. (Tr. at 12). Turner's demeanor was pleasant and cooperative, and the conversation was normal and was just about the complaint. (Tr. at 12-13). The officers lawfully gained entry into the apartment. See United States v. Cruz-Mendez, 467 F.3d 1260, 1265 (10th Cir. 2006) ("Consent can justify an entry into a home, regardless of whether there is probable cause."); United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir.

19

2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).[14]

There are no objective facts that indicate that the officers' purpose in conducting the knock and talk was solely to conduct a search.  Officer Scurr was acting on the complaint relayed to him by Tish about the odor of marijuana - a complaint that was confirmed when he detected the odor as he approached the apartment door.  There were only two officers, who did not have weapons drawn, did not snoop around the outside of the apartment or peek into the apartment's windows, approaching Defendant's residence to conduct the knock and talk.  The mere fact that Officer Scurr hoped to be allowed into the apartment does not invalidate the lawful purpose of the knock and talk - Turner retained the authority to refuse to speak with the officers and was not required to invite them inside.  See Holmes, 143 F. Supp. 3d at 1258 ("A resident is free to not open the door and to not talk if he does open the door. . . . 'And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time.'") (quoting King, 131 S. Ct. at 1862).

---

[14]Beyond challenging the validity of the knock and talk, Defendant does not otherwise contest the voluntariness of Turner's consent to enter the apartment.  [Doc. 38].

Accordingly, the court finds that Officer Scurr's approach to the residence was for a legitimate police purpose. See Holmes, 143 F. Supp. 3d at 1258 ("officers [may] approach a house with or without probable cause and knock on the door to, for example, question the resident about possible criminal activity there or elsewhere, or try to gain consent to search") (citing King, 131 S. Ct. at 1860); United States v. Torres-Castro, 374 F. Supp. 2d 994, 1009 (D. N.M. 2005) ("[O]fficers generally may 'go to a person's home to interview him' . . . because '[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business[.]'") (citations omitted).  And the officers did not display any overbearing tactics or coercive police conduct in approaching the apartment, knocking, speaking with Turner and asking for her cooperation. See Maxi, 886 F.3d at 1327 (finding that tactics including large number of officers at scene, officers setting up a perimeter around the property, and drawn weapons indicated a purpose other than conducting a valid knock and talk); United States v. Thomas, 430 F.3d 274, 277-78 (6th Cir. 2005) (noting the difference between a consensual "knock and talk" and an unlawful entry "turns on the show of force exhibited by the police" which is typically exhibited by weapons being drawn, raised voices, use of spotlights and bullhorns and orders being issued); Torres-Castro, 374

21

F. Supp. 2d at 1009 (listing factors that courts have found could result in a sufficient show of official authority:  threatening presence of several officers, display of weapons, physical touching, use of aggressive language or tone of voice, prolonged detention of identification documents, requests to accompany officer to police station, interaction in nonpublic place and absence of other members of the public).

The evidence also does not support a finding that Officer Scurr arrived at the residence for the sole purpose of seeking consent to conduct a search.  As the officers entered, Officer Scurr walked a few feet over to one side to see into the kitchen to determine whether anyone else was inside the apartment.  (Tr. at 28).  In response to Officer Scurr's statement about the odor of marijuana, Turner advised that she had just been smoking in the bathroom - doing so in order to avoid smoking in front of the children.  (Tr. at 13, 29).  Officer Scurr asked who else lived in the apartment and if Defendant was at work.  (Tr. at 14).  She responded that he was in weekend jail for a drug charge.  (Tr. at 13, 15).  And she advised that her two male children aged twelve, who was in school, and aged fifteen, who was home sick, lived in the apartment.  (Tr. at 13).  She also explained that the fifteen year old was supposed to have appeared in juvenile court that day but for being sick.  (Tr. at 13).  Although Officer Scurr does not always ask for consent to search, he decided to do so based on the information he

22

found out *after* entering the apartment and *not based on* the information about the problems with the lease.  Turner agreed to the search.[15]  (Tr. at 13-15; 30-31).

In response to questioning on cross-examination about the decision to seek Turner's consent, Officer Scurr testified:

> It had nothing to do with the social security number.  Once I got into the apartment and started talking with Ms. Turner what started to raise my suspicions was when I asked about the other occupants and the tenant of the apartment.  Once she told me that the tenant was, in fact, in jail for a felony and that another occupant of the apartment had failed to appear on a separate subpoena for juvenile court, that started to lead me to believe that possibly there was something else going on in the apartment.  So that's when I decided I was going to either - - I had probable cause for a search warrant at that point anyway.  At that point I decided to give Ms. Turner the benefit of the doubt to see what's in the apartment versus going and getting a warrant . . . .

(Tr. at 30-31).  Turner led the officers to the bathroom, and they observed a partially burned marijuana cigarette and the innards of a "blunt" or "cigar."  (Tr. at 13, 31).  The officers were entitled to act upon and respond to the information obtained during the consensual encounter with Turner by seeking her consent to search the apartment.  See Benitez-Garcia, 2009 WL 10688895, at *3 (as a part of a knock and talk, "[i]t . .

_____

[15]Defendant does not challenge the voluntariness of Turner's consent to search the residence.  [Doc. 38].

. is a valid strategy to seek an occupant's consent to a search when officers reasonably suspect criminal activity.") (citation omitted).

Likewise, the evidence does not support Defendant's argument [Doc. 38 at 7] that Officer Scurr's purpose for conducting the knock and talk was invalid because he did so to investigate the problems with the lease - which Defendant contends is not a lawful investigative purpose - and not the complaint about the odor of marijuana. (Tr. at 22, 27, 30-31). Besides the officer's undisputed and credible testimony that he conducted the knock and talk to investigate the odor of marijuana, as the Government correctly points out, an investigation into whether a false social security number or other false - fraudulent - information was used by Defendant to obtain the lease would have constituted a lawful investigative purpose for the knock and talk. [Doc. 39 at 11 (citing O.C.G.A. 16-9-120 ("defining the felony offense of identity fraud, which includes the use of another person's actual social security number or the creation of a false social security number for fraudulent purposes"))].

Finally, due to the concerns that Turner was withdrawing her consent to the search the residence, Officer Scurr stopped the consensual search and obtained a search warrant based solely on the information that he had obtained before entering the residence. (Tr. at 13-16, 32-33; Gov't Exhs. 1, 2, 3). As a result of execution of

24

the search warrant, quantities of marijuana (packaged as if for distribution), two firearms and digital scales, along with paperwork bearing Defendant's name, were seized from the apartment.  (Tr. at 16-18).[16]

For these reasons, the court **RECOMMENDS** that Defendant's motion [Docs. 19 and 38] to suppress evidence be **DENIED**.

## III.   Conclusion

Based on the foregoing cited authority and for the reasons stated, the court **RECOMMENDS** that Defendant's motion [Docs. 19 and 38] to suppress evidence be **DENIED** and that Defendant's motions [Docs. 18 and 20] be **DENIED** as **MOOT**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

---

[16]As noted, besides contending that the items found in the apartment were the fruits of an unlawful knock and talk, Defendant does not otherwise challenge the search warrant or its execution. [Doc. 38].  Defendant's argument based on the "fruits of the poisonous tree" is merit less.  See United States v. Lopez-Garcia, 565 F.3d 1306, 1315 (11th Cir. 2009) (the defendant's "fruit of the poisonous tree argument plainly collapses since . . . his Fourth Amendment rights were never violated").

AO 72A
(Rev.8/82)

**SO RECOMMENDED** this 27th day of January, 2020.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

26